**Alma E. PECK, Plaintiff,**

v.

**EIMCO PROCESS EQUIPMENT CO., Second Injury Fund and Industrial Commission of Utah, Defendants.**

**No. 20914.**

Supreme Court of Utah.

Dec. 31, 1987.

---

**1.** *See generally, Utah Hotel Co. v. Industrial* *Commission,* 107 Utah 24, 151 P.2d 467 (1944).

Roger D. Sandack, Salt Lake City, for Peck.

Robert R. Finch, Salt Lake City, for Eimco.

Erie Boorman, Salt Lake City, for Second Injury Fund.

David L. Wilkinson, Ralph L. Finlayson, Salt Lake City, for Indus. Comn.

STEWART, Associate Chief Justice:

This is an action by plaintiff Alma E. Peck challenging an Industrial Commission order denying him permanent total disability benefits. We reverse and remand.

While employed by Eimco Processing Equipment Company as an industrial maintenance mechanic, Peck suffered two compensable industrial injuries which resulted in permanent physical impairment. The first injury, on September 12, 1980, required surgery on Peck's right knee and caused a two percent impairment of the body. The second injury, on December 29, 1982, necessitated surgery on Peck's lower back and resulted in a ten percent loss of body function. Peck was then sixty-three years old.

Although Peck's last injury occurred in December, 1982, he continued to work until March 7, 1983, when his doctor prescribed surgery. On March 17, back surgery was performed. On June 27, 1983, Peck returned to work under light-duty restrictions. Peck applied to the Commission for temporary total disability benefits from March 7 to June 27 and for permanent partial disability benefits thereafter, claiming that the surgery on his back failed to restore his ability to return to his normal work. The Commission set a hearing for October 17, 1983.

After the hearing, the administrative law judge appointed a medical panel to evaluate Peck's case. The medical panel concluded that Peck suffered a twenty-four percent preexisting physical impairment and that the industrial injuries combined with the preexisting impairments to produce a thir-

ty-three percent permanent physical impairment.

On April 27, 1984, Peck turned sixty-five years old. The next day, April 28, ten months after returning to work following the back surgery, Peck retired. Peck then requested a determination regarding permanent total disability from the Commission. A second hearing was set for September 25, 1984. After the second hearing, the Commission sent Peck to the Division of Rehabilitation Services to determine whether he could be rehabilitated for other employment. The rehabilitation officer concluded that due to his age and physical impairments, Peck was not a good candidate for rehabilitation.

On February 28, 1985, the administrative law judge issued his findings of fact and conclusions of law. Among his findings, the judge stated:

> The Applicant worked effectively before the December 1982 injury despite his 27% pre-existing impairment.... The December 1982 incident only added a 10% impairment. The Applicant was able to work effectively in his job for about a year after his injuries healed. There is no evidence of new injury, nor is there any medical evidence that the Applicant was taken off the job April 28, 1984, because of his old injuries. The Applicant just plain retired.

The judge ruled, however, that Peck was entitled to temporary total disability benefits for the period from March 7 to June 27 and, "[w]ith great reluctance," that Peck was permanently and totally disabled under existing Utah case law and entitled to benefits accordingly.

Defendant Second Injury Fund appealed to the Commission to reverse the award of permanent total disability benefits. Although the Commission upheld the award of temporary total disability benefits, it reversed the award of permanent total disability benefits. The Commission based its reversal on the judge's findings that Peck "did not leave work on April 27, 1984 because of old or new injuries" and that Peck "just plain retired." The Commission concluded that Peck failed to meet "his burden

in showing an inability to return to work," as required by Utah Code Ann. § 35–1–67 (Supp.1987).

Peck seeks review of the Commission's order denying permanent total disability benefits. The issues raised are (1) whether Peck is entitled, due to his industrial injuries, to permanent total disability benefits under the odd-lot doctrine pursuant to Utah Code Ann. § 35–1–67, and (2) whether there is evidentiary support for the findings of fact made by the administrative law judge and adopted by the Commission that Peck was "able to work effectively in his job for about a year after his injuries healed" and that he "just plain retired."

### I.

The ultimate issue presented by this case is whether Peck is entitled to permanent total disability benefits provided by Utah Code Ann. § 35–1–67 under the odd-lot doctrine enunciated in *Marshall v. Industrial Comm'n*, 681 P.2d 208 (Utah 1984).

In *Marshall*, the Court stated, "Under the odd-lot doctrine, ... total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market." 681 P.2d at 212 (quoting 2 Larson, *The Law of Workmen's Compensation* § 57.51, at 10–164.24 (1983)). The Court further stated:

> [A] workman may be found totally disabled if by reason of the disability resulting from his injury he cannot perform work of the general character he was performing when injured, or any other work which a man of his capabilities may be able to do or to learn to do....

*Id.* at 211 (quoting *United Park City Mines Co. v. Prescott*, 15 Utah 2d 410, 412, 393 P.2d 800, 801–02 (1964)) (emphasis omitted). The Court further stated that the term "disability" means the loss of wage-earning capacity and that a disability must be assessed in terms of the specific individual who has suffered a work-related injury, taking into account such factors as age, education, training, and mental capacity. "It is the unique configuration of these

factors that together will determine the impact of the impairment on the individual's earning capacity." *Id.* at 211. *See also Norton v. Industrial Comm'n,* 728 P.2d 1025, 1027 (Utah 1986); *Hardman v. Salt Lake City Fleet Management,* 725 P.2d 1323, 1326–27 (Utah 1986). Furthermore, Professor Larson states:

"Total disability" in compensation law is not to be interpreted literally as utter and abject helplessness. Evidence that claimant has been able to earn occasional wages or perform certain kinds of gainful work does not necessarily rule out a finding of total disability nor require that it be reduced to partial....

... The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.

2 Larson, *The Law of Workmen's Compensation* § 57.51(a), at 10–164.65, 10–164.-84(18) (1987) (footnotes omitted).

We enunciated in *Marshall* the procedure for an employee to prove that he is entitled to permanent total disability benefits under the odd-lot doctrine. The employee must first present a prima facie case that no regular, dependable work is available to him. To do this, the employee must present "evidence that he can no longer perform the duties required in his occupation and that he cannot be rehabilitated" to perform some other type of employment. *Marshall,* 681 P.2d at 212. Once the employee has presented a prima facie case, "the burden shifts to the employer to prove the existence of regular, steady work that the employee can perform, taking into account the employee's education [work experience], mental capacity and age." *Id.* Failure by the employer to meet its burden of proof entitles the employee to permanent total disability benefits.

Peck argues that he presented a prima facie case of permanent total disability under the odd-lot doctrine by proving that he was sixty-three years old at the time of his last industrial accident, had no formal education beyond high school, worked his entire life in heavy manual labor, was no longer capable of performing the duties of his job, and could not be rehabilitated. The administrative law judge, however, found that Peck "was able to work effectively in his job for about a year after his injuries healed" and that Peck "just plain retired" the day after he turned sixty-five years old.

In reviewing the evidentiary basis for findings of fact made by the Industrial Commission, this Court inquires only whether the Commission's findings are supported by substantial evidence. *Bigfoot's Inc. v. Industrial Comm'n,* 714 P.2d 1152, 1153 (Utah 1986). On a thorough review of the record, we conclude that the findings of fact made by the administrative law judge and adopted by the Commission are unsupported by the evidence and must be set aside.

The record contains evidence introduced primarily in two hearings, including letters from physicians, a medical panel's report, and an evaluation of Peck by the Division of Rehabilitation Services. The record is replete with evidence that Peck was unable to perform the normal duties of his occupation, that he required the aid of his fellow employees who performed the bulk of his work for him, and that he suffered continual pain as a result of his industrial injuries.

For example, in the first hearing, on October 17, 1983, four months after returning to work following his back surgery, Peck testified that he could no longer perform the duties of his job. He testified that his doctor told him to "be careful, move slow and not lift any more than I have to" and that he "hoped my co-workers would take the brunt of the load and help me so that I could carry on." He also testified that he was unable to lift anything or bend over because of pain in his legs and back and that after working a few days, his leg would go numb. Peck's own testimony was supported in the record by two letters written to Eimco by Peck's doctor. In the

first letter, dated one week before Peck returned to work June 27, 1983, the doctor advised Eimco that Peck would require light-duty work and good care in the exercise of his duties. The doctor also stated, "Cooperation from his supervisors and co-workers would be helpful to [Peck]." In the second letter, dated one month after Peck returned to work, the doctor notified Eimco that Peck was "concerned about his ability to perform [the] heavy work assigned to him" because of his impairments. The doctor stated that Peck was "trying to do his work and I believe is conscientiously pursuing this goal," but "[w]hether or not he will continue to be able to carry out the duties assigned to him we will simply have to wait and see."

In addition to Peck's testimony, three of his fellow employees were present at the hearing and, upon agreement of the parties, proffered their testimony through Peck's attorney. According to the proffered testimony, one of the witnesses "would testify as to [Peck's] limitations from and after [his back injury and] how people have had to help him, [and] the fact that he has really been getting along with their help."

At the second hearing, on September 25, 1984, five months after Peck retired from Eimco, Peck again testified that he could not adequately perform his work. When asked what kind of job activities he did upon returning to work, Peck answered:

> Well, I was still in maintenance, but I wasn't able to do my work. I couldn't have stayed there, but the guys I worked with were kind enough to take the buffer and make it possible for me to hang on.
>
> . . . .
>
> They did all the lifting. If I had required any extra lifting or anything, they helped me with it because I couldn't do it.

When asked to specify the work constituting his normal duties that he could no longer perform, Peck stated:

> Well, in lifting, a lot of that machinery you have to work it into place. You take a big gearbox out, you have to let it down, and you have to manhandle it, or

you take out gears and they're hard to lift. . . . I couldn't do the work that I had done all the years I'd been there.

When asked his reasons for retiring, Peck responded that one day he and a fellow employee were moving a big gearbox, trying to get it into place, when "[m]y back gave out on me, my legs went, I fell down, I hit my head . . . and if someone had been depending on me supporting my share of it . . . somebody could have been hurt very bad." He also testified that another reason he retired was that his department had just undergone a reorganization which split-up the crew he had been working with and would require that each employee do more jobs by himself and that he just could not do the work.

At the second hearing, Dr. Holbrook, who headed the medical panel, testified. When Peck's attorney asked Dr. Holbrook his opinion of whether Peck was physically capable of doing his work at Eimco, he replied:

> I think it's a reasonable assumption that he might or might not . . . you just about have to follow him around all day for a lot of days. But, if Mr. Peck says he can't do it, I believe that would be a reasonable assumption to make, based upon all the various impairments that he has.

Additional evidence supports Peck's claims that he was unable to adequately perform his job following his injuries. The medical panel's report, issued prior to the second hearing, states that Peck's knees are "aggravated by his work activities because of the weakness of his back throwing more stress on his knees when he lifts" and that his right knee "does occasionally pop," but that mostly there "is a deep ache that becomes very sore with a lot of activities." Referring to Peck's back, the report states, "He does still get some numbness and tingling in the right lower extremity particularly with lifting. . . ." The report also states that Peck "has returned to work but is working more as a helper." In further support of Peck's claims, the Rehabilitation Services evaluation of Peck states that his "back and knee are a continuing problem"

and that he "is not a good candidate for Rehabilitation."

Nowhere in the record did Eimco ever contradict either Peck's testimony or that of his fellow employees that he was unable to perform his job. Nor did Eimco present any evidence or testimony that Peck could, and did, adequately perform his job or the duties of any other job generally available. Eimco attempts to support the Commission's finding that Peck worked effectively in his job following his injuries by citing that portion of the record wherein Peck was asked if he had ever "had to turn down any jobs that had been assigned to" him and Peck answered that he had not.

However, a proper reading of the context of Peck's answer quickly dispels any notion that it supports the Commission's finding. Peck was asked, "[A]re you able to perform the jobs assigned to you?" He responded, "[J]ust with help." Eimco's attorney then rephrased the question and asked, "[H]ave you had to turn down any jobs?" Peck replied that he had not accepted any. At that point, the judge intervened:

THE COURT: You haven't been assigned any jobs or you haven't—
THE WITNESS: Any jobs that weren't very minor jobs. The jobs I have worked on, others have been with me and taken the brunt of it and I have been more a helper than anything else and that's about all I have been, is a helper.
THE COURT: The question was, have you had to turn down any jobs that have been assigned to you.
THE WITNESS: No.

In this context, Peck's response that he had not turned down any jobs that had been assigned to him does not support a conclusion that he was capable of performing the tasks required in his job. On the contrary, Peck not only explained that he was unable to perform his normal duties, but also that Eimco had not assigned him the types of jobs he had performed prior to his injury.

Next, Eimco argues that Peck's return to work following his last injury supports the judge's findings. Evidently, the fact that Peck returned to work and continued to work until he retired at age sixty-five was a principal factor in the Commission's denial of permanent total disability benefits. The Commission stated:

In the *Marshall* case, the Applicant was unable to return to work after his industrial accident. Here, [Peck] was obviously able to return to work because in fact he did. [Peck] worked for nearly one full year after his final industrial accident, and retired on the day after he turned sixty-five years old. The facts in this case do not show that [Peck] has met his burden of proof in showing inability to return to work as is required by [Utah Code Ann. § 35–1–67].

■ Although the fact that an employee returns to work following an industrial injury may be relevant in determining the employee's ability to perform the duties of his occupation and thus may be a factor in assessing whether the employee has suffered any loss of earning capacity, that fact alone is not conclusive of his ability to work, nor is it dispositive of the issue of his earning capacity. We have recently held that "[o]nly where the employee returns to work under normal conditions will the presumption of no loss of earning capacity stay unassailed." *Norton v. Industrial Comm'n*, 728 P.2d at 1028.

■ In *Norton*, we held that the fact that the claimant returned to work and continued to work for six years following his industrial accident "did not automatically disqualify him from receiving permanent total disability benefits, where the facts indicate[d] that throughout the remainder of his employment he was not restored to health." *Id.* Other jurisdictions have also awarded permanent total disability benefits even though the claimant returned to work following the industrial injury. *See Roberts v. WPBT*, 395 So.2d 233, 234 (Fla.Dist. Ct.App.1981); *Liberty Mut. Ins. Co. v. Archer*, 108 Ga.App. 563, 564, 134 S.E.2d 204, 205 (1963); *Schober v. Mountain Bell Tel.*, 96 N.M. 376, 381, 630 P.2d 1231, 1236 (N.M.Ct.App.1980); *Harmon v. SAIF*, 71 Or.App. 724, 727, 693 P.2d 1366, 1368 (1985); *Texas Employer's Ins. Ass'n v. Armstrong*, 572 S.W.2d 565, 566 (Tex.Civ. App.1978). *See also Allen v. Fireman's*

*Fund Ins. Co.*, 71 Or.App. 40, 45–46, 691 P.2d 137, 140 (1984). *But see Special Indem. Fund v. Stockton*, 653 P.2d 194, 196 (Okla.1982). At most, the fact that an employee returns to work after an industrial injury creates a "rebuttable presumption that the claimant has not sustained permanent and total disability." *Special Indem. Fund v. Stockton*, 653 P.2d at 198.

■ In this case, Peck presented uncontroverted evidence not only of his physical impairment, but also of his inability to perform his job, including evidence that he was in continual pain and that his fellow employees did much of his work for him. Eimco did not controvert Peck's evidence, and as the record stands, Peck clearly rebutted any presumption that he was able to work effectively following his injuries.

■ Eimco next contends that the judge's finding that Peck "just plain retired" the day after he turned sixty-five years old supports the Commission's denial of permanent total disability benefits.[1] In *Marshall*, however, we held that the determination whether to award permanent total disability benefits must focus on the decline in claimant's wage-earning capacity and not on the claimant's eligibility to retire. 681 P.2d at 213. The mere fact that an employee has retired will not adversely affect a determination of permanent total disability when the employee has demonstrated that his disability from the industrial injury significantly influenced his decision to retire. *See Arizona Pub. Serv. Co. v. Industrial Comm'n*, 145 Ariz. 117, 119, 700 P.2d 504, 506 (Ariz.Ct.App.1985); *Liberty Mut. Ins. Co. v. Archer*, 108 Ga.App. 563, 564, 134 S.E.2d 204, 205 (1963); *Molyneux v. New York Tel. Co.*, 101 A.D.2d 903, 903, 475 N.Y.S.2d 599, 600 (N.Y.App.Div. 1984); *Bahor v. New York Tel. Co.*, 91 A.D.2d 756, 756, 458 N.Y.S.2d 24, 25 (N.Y. App.Div.1982); *Robinson v. New York Tel. Co.*, 86 A.D.2d 916, 916, 448 N.Y.S.2d 252, 253 (N.Y.App.Div.1982); *Wheeling–Pittsburgh Steel Corp. v. Workmen's Compensation Appeal Bd.*, 70 Pa.Cmwlth. 100, 452 A.2d 611, 613 (1982). *See also Tsuchiyama v. Kahului Trucking and Storage*, 2 Haw.App. 659, 638 P.2d 1381, 1382 (Haw. Ct.App.1982).

■ Only when a finding is made and supported by evidence that the employee's retirement is not substantially motivated by his industrial injury, but is due primarily to personal or other reasons, will a denial of disability benefits be upheld on the basis of voluntary retirement. *See Saenger v. Liberty Carton Co.*, 281 N.W.2d 693, 695 (Minn.1979); *Cameron v. Carrier Air Conditioning Co.*, 85 A.D.2d 864, 865, 446 N.Y.S.2d 499 (N.Y.App.Div.1981); *Osowski v. Board of Coop. Educ. Serv.*, 78 A.D.2d 740, 741, 432 N.Y.S.2d 729, 730 (N.Y.App. Div.1980).

■ Since none of the defendants has produced evidence that Peck was able to perform his job adequately or that his retirement was not substantially related to his industrial injury, we must conclude that the Commission's findings are wholly unsupported by the evidence.

We find that Peck presented a prima facie case entitling him to permanent total disability benefits under the odd-lot doctrine, as set forth in *Marshall*. The following language from *Marshall* controls this case:

> He presented uncontroverted evidence of his impairment, his inability to perform the work required by his job and the opinion of the division of vocational rehabilitation that he could not be rehabilitated. He also testified that prior to his injury he had fully intended to work rather than to retire.

681 P.2d at 213.

On this showing, the burden shifted to Eimco to demonstrate the availability of regular work which Peck could perform to indicate whether he had any reasonable wage-earning capacity. Eimco relied only on the facts that Peck returned to work

---

**1.** The fact that Peck retired is, of course, true. If that is all that the Commission meant by its finding, it would have little significance. However, we read the finding to indicate that the Commission believed that Peck retired because he simply desired to do so rather than being, in effect, compelled to do so.

following his injury and then retired ten months later. Thus, Eimco failed to show any reasonable wage-earning capacity which rebutted Peck's prima facie entitlement to permanent total disability benefits.

## II.

This Court may set aside the Commission's award if unsupported by the findings of fact. Utah Code Ann. § 35–1–84(2) (1974). In this case, the administrative law judge adopted the findings of the medical panel that Peck's total physical impairment was thirty-three percent. However, neither the judge nor the Commission in its review of the judge's decision made any separate assessment of Peck's disability by calculating the effect that factors such as age, education, and training, in addition to his permanent physical impairments, had on his wage-earning capacity and his ability to compete in a competitive job market. We have previously held that the Commission's adoption of a medical panel's findings of physical impairment, without further evaluation of the effect which that impairment, when combined with other factors, might have on a claimant's wage-earning capacity, constitutes a failure by the Commission to carry out its administrative responsibilities under the well-recognized odd-lot doctrine. *See Norton,* 728 P.2d at 1027; *Hardman v. Salt Lake City Fleet Management,* 725 P.2d at 1326. In short, the Commission's findings on disability are therefore inadequate to support a denial of permanent total disability benefits.

## III.

In sum, we hold that the Commission's finding that Peck "was able to work effectively in his job for about a year after his injuries" and that he "just plain retired," are unsupported by the evidence and must therefore be set aside. We also hold that the denial of permanent total disability benefits is unsupported by the Commission's findings of fact. Accordingly, we reverse and remand this case to the Commission for further proceedings consistent with this opinion, including a reassessment of dis-

ability and a recomputation of benefits based on permanent total disability.

HALL, C.J., and HOWE, DURHAM and ZIMMERMAN, JJ., concur.